**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **WHEEL RECOVERY SYSTEMS LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **NO.:** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **BRUCE W. NICHOLS; THOMAS WALTERS;** | ) | |
| **CHERYL ROARK; NATIONAL WHEEL,** | ) | |
| **LLC; NATIONAL WHEEL REPAIR;** | ) | |
| **NICHOLS PROPERTIES, LLC;** | ) | |
| **NATIONAL ALLOYS CORPORATION;** | ) | |
| **ASSURANCE PACKAGING, LLC;** | ) | |
| **WILLIAM GANDEE; JAMES FRASIER;** | ) | |
| **MITCH NUNES; KARL TIPTON;** | ) | |
| **and DUANE COAD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT

Plaintiff WHEEL RECOVERY SYSTEMS LLC ("WRS" or "Plaintiff"), by and through undersigned counsel, brings this action alleging the following against Defendants BRUCE W. NICHOLS; THOMAS WALTERS; CHERYL ROARK; NATIONAL WHEEL, LLC; NATIONAL WHEEL REPAIR; NICHOLS PROPERTIES, LLC; NATIONAL ALLOYS CORPORATION; ASSURANCE PACKAGING, LLC; WILLIAM GANDEE; JAMES FRASIER; MITCH NUNES; KARL TIPTON; and DUANE COAD (collectively, "Defendants"):

## INTRODUCTION

WRS trusted Bruce Nichols and Thomas Walters to run its specialized vehicle wheel salvage business for nine years. Yet, beginning in 2018, they breached that trust and started their own wheel salvage business out of WRS offices, with WRS employees, equipment, suppliers and

1

trade secrets. This continued until 2022 when Richard Bauer, the managing member of WRS, discovered their conspiracy to operate this business with WRS resources. Among other things, the conspiracy involves a kickback to a supplier using WRS funds, a fraudulent packaging scheme to overcharge WRS and line the pockets of the Defendants, and theft of the proprietary database developed by WRS over many years. Upon WRS's discovery of this illegal conduct, the Defendants left WRS and overtly started their own competing business, taking WRS employees, suppliers and trade secrets with them. William Gandee ran the WRS proprietary system but has left WRS to run this stolen system for Defendants, in violation of his noncompete. Given Defendants' unlawful conduct and ongoing unfair competition, WRS requests immediate injunctive relief and damages.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1338, 28 U.S.C. § 1836(b)(1) and (c) and the other federal statutes cited herein.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 and 28 U.S.C. § 1331.

3. Venue exists in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because one or more of the Defendants conduct business and/or reside within this judicial district, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and a substantial part of the property that is the subject of this action is situated in this judicial district.

## PARTIES

### Plaintiff

4. WRS is a Delaware limited liability company headquartered in Tennessee, with its

2

principal place of business at 115 Franklin Road, Oak Ridge, Anderson County, Tennessee. WRS is owned and managed by its sole manager and sole member, Richard H. Bauer ("Bauer").

5.     WRS is engaged nationally in the purchase, identification, processing, marketing and sale in interstate commerce of (a) rims and wheels, including used vehicle wheels, which are the metal wheels that vehicle tires are mounted on, and the caps or covers on rims and wheels, regardless of whether any of the rims, wheels, caps, or covers are made from aluminum, any metal alloy, steel, or any other material, (b) scrap aluminum, scrap steel, and other scrap metal or other material involved in any part or all of any rim, wheel, balancing metal, cover or cap, or other material from a vehicle wheel other than the rubber or synthetic material tire, and (c) other automotive scrap, such as tire valves and wheel balancing metal, that customers send or have sent to WRS along with rims and wheels, that WRS sorts, processes and recycles as part of its services to its customers and suppliers. Generically, this industry is referred to as the "vehicle wheel salvage business" or "wheel processing industry."

## Defendants

6.     BRUCE W. NICHOLS ("Nichols") is a resident of Tennessee and can be served with process at 3723 Jackson Bend Dr., Louisville, Blount County, Tennessee 37777-3775. Nichols was a Vice President of WRS and co-chief operating officer of WRS from its inception in 2013 until Nichols resigned on April 25, 2022. Nichols has never held any ownership interest in WRS. Nichols is presently employed by and an owner of one or more of Defendants National Wheel Repair, National Wheel, LLC, Nichols Properties, LLC, National Alloys Corporation, and Assurance Packaging, LLC (collectively, "National Wheel Entities"), which are affiliated entities with common ownership.

7.     THOMAS WALTERS ("Walters") is a resident of either Maryland or Tennessee

and can be served with process at his last known address of 1603 Kings Forest Trail, Mt. Airy, Maryland 21771. Walters was a Vice President and co-chief operating officer of WRS from its inception in 2013 until Walters resigned on May 9, 2022. Walters is an investor in WRS. Walters is presently employed by and an owner of one or more of the National Wheel Entities.

8. CHERYL ROARK ("Roark") is a resident of Tennessee and can be served with process at 1325 Grand Colony Lane, Powell, Knox County, Tennessee 37849-2929 or at 5005 Jenkins Rd., Knoxville, Tennessee 37918-2228. Roark was an accountant and de-facto office manager for WRS and later was promoted by Nichols to be the "Business Manager" of WRS, from approximately May 2016 until she resigned on August 1, 2022. Upon information and belief, Roark is currently employed by one or more of the National Wheel Entities.

9. NATIONAL WHEEL REPAIR ("National Wheel") is a General Partnership and, upon information and belief, the partners are Walters and Nichols. National Wheel can be served with process through its partner Bruce Nichols at 3723 Jackson Bend Dr., Louisville, Blount County, Tennessee 37777-3775. National Wheel is in the vehicle wheel salvage business, and conducts business in Florida and in Tennessee, including from at least May 2018 if not earlier, and did so all the while from within WRS's facility by using WRS's employees, facilities, and materials without approval by WRS, and without paying for them, and transacts business with customers and suppliers throughout the United States as a direct competitor of WRS.

10. NATIONAL WHEEL, LLC is a limited liability company organized under the laws of Tennessee on July 13, 2020 and is owned by Nichols and Walters. National Wheel, LLC can be served with process through its registered agent Bruce W. Nichols, 3723 Jackson Bend Dr., Louisville, Blount County, Tennessee 37777-3775. National Wheel, LLC does business throughout the United States as a direct competitor of WRS.

4

11. NICHOLS PROPERTIES, LLC is a Tennessee limited liability company and can be served with process through its registered agent Bruce W. Nichols, 3723 Jackson Bend Dr., Louisville, Blount County, Tennessee 37777-3775. Upon information and belief, Nichols Properties, LLC is owned by Nichols alone or with Walters.

12. NATIONAL ALLOYS CORPORATION ("National Alloys") is a Tennessee corporation and can be served with process through its registered agent Bruce Nichols, 3723 Jackson Bend Dr., Louisville, Blount County, Tennessee 37777-3775. Upon information and belief, National Alloys is owned, at least in part, by Nichols and Walters. National Alloys is in the vehicle wheel salvage business and conducts business in Tennessee and throughout the United States as a direct competitor of WRS.

13. ASSURANCE PACKAGING LLC ("Assurance") is a limited liability company organized under the laws of Tennessee and can be served with process through its registered agent John R. Faust, 4641 Chambliss Avenue, Knoxville, Knox County, Tennessee 37919-5119.

14. WILLIAM GANDEE ("Gandee") is a resident of Tennessee and can be served with process at 2817 Milford Ave., Maryville, Blount County, Tennessee 37804. Gandee was a Coreman at WRS until his resignation on August 5, 2022 and is now employed by one or more of the National Wheel Entities.

15. JAMES FRASIER ("Frasier") is a resident of Tennessee and can be served with process at 2257 Stonybrook Rd., Louisville, Tennessee 37777. Frasier was a WRS employee until his resignation on July 29, 2022 and is now employed by one or more of the National Wheel Entities.

16. MITCH NUNES ("Nunes") is a resident of Tennessee and can be served with process at 787 Tanasi Trail, Townsend, Ln., Tennessee 37882. Nunes was the owner and CEO of

Jante Wheel US LLC, a Florida limited liability company that is qualified to do business in Tennessee.

17.     KARL TIPTON ("Tipton") is a resident of Tennessee and Arizona and can be served with process at 14022 S. 131st St., Gilbert, Arizona 85233.   Tipton is an employee of one of WRS's major suppliers, Reinalt-Thomas Corp. which does business throughout the United States either itself or through subsidiaries, as Discount Tire, which has now re-directed all former sales to WRS to one or more of the National Wheel Entities.

18.     DUANE COAD ("Coad") is a resident of Florida and can be served with process at 121 28th Avenue NE, St. Petersburg, Florida 33704-2938 or 970 Carillon Lake Dr., St. Petersburg, Florida 33716.  Coad is a key employee of one or more of the National Wheel Entities in Florida.    He transacts business on a continuous basis within Tennessee.

## FACTS

### The Formation of WRS and the Beginning of National Wheel

19.     Bauer appointed Walters and Nichols as Vice Presidents of WRS in 2013, with both of them serving as co-chief operating officers.  In fact, it was Walters who introduced Nichols to Bauer.  Bauer and other investors financed the operations of WRS.

20.     Bauer trusted Walters, his longtime Vice President, since 2001, at Service Aluminum Corp. ("SACO") so much so that Bauer designated Walters to supervise Nichols and the operation of WRS in Tennessee.  Bauer resided in New York, the location of the administrative and accounting operations for WRS, and now resides in Florida.

21.     In approximately 2017, Nichols proposed to Bauer that WRS expand into a wheel repair business.  From its inception in 2013 through 2017, WRS was not profitable.  Bauer rejected Nichols' idea as premature and stated that Nichols should focus his efforts instead on first making

6

WRS profitable.

22.     Following that rejection, and unknown to Bauer at the time, a conspiracy began among Nichols, Walters, Roark, and Nunes to begin a wheel repair business with the use of WRS resources, WRS property, WRS finances, and WRS employees.  The design of the conspiracy was to harm WRS while benefitting the new wheel repair business launched by these conspirators until they left WRS at what they deemed to be an opportune time to begin their own competing business in their own facility with WRS customers, suppliers, and employees.  As described herein, this conspiracy involved brazen breaches of fiduciary duty, acts of conversion, acts of theft of WRS property and business opportunities, at least one identifiable kickback, a pattern of racketeering, and theft of trade secrets.

23.     Bauer did not discover this conspiracy until 2022.

24.     Nichols, Walters, Roark, and Nunes utilized each of the National Wheel Entities to carry out their conspiracy to harm WRS and to steal WRS's competitive assets for the benefit of the National Wheel Entities.

**WRS Confidential and Proprietary Information**

25.     Over the years, WRS has developed strong customer and supplier relations and goodwill.  As an integral part of its business and to remain a competitive leader in the wheel processing industry, particularly in the Southeast from its headquarters in Tennessee, WRS has expended significant time and resources on a processing system described below, on employee training, and on sales and marketing.  WRS has generated confidential and proprietary data regarding is suppliers, customers, employees, and processing methods.

26.     The business operations of WRS relied heavily on a patented system of photographing the used wheels WRS picked up or otherwise received from suppliers to create a

7

proprietary database that could scan and automatically recognize the wheels (the "cores") that were collected and were able to be sold (the "cores") after being matched to the published industry-standard Hollander list, the WRS-created library of wheel images, or other relevant lists ("the Wheel Processing System").

27.     Patent applications were filed by WRS on June 6, 2014; October 21, 2015; September 22, 2016; and September 14, 2018, for Core Wheel Processing System and Method, and four patents were issued to WRS by the United States Patent and Trademark Office.

28.     This patented Wheel Processing System, including the WRS proprietary database and image library of cores/wheels that was developed over several years and how it integrates with the Hollander list, are key trade secrets for WRS's business. This System and database is critical to the operation of WRS and was misappropriated as part of the conspiracy for the benefit of one or more of the National Wheel Entities and the individual Defendants.

29.     The Wheel Processing System and proprietary database are not readily available anywhere. The value to WRS is incalculable because without it WRS cannot readily identify the wheels that it processes for resale. A competitor misappropriating it would save years of time, money, and effort to create their own. WRS has spent significant time, money, and effort developing this System and database. Only certain select employees of WRS had access to it.

30.     WRS financial records are also confidential and proprietary and accessible only to a few individuals at WRS. Yet, without authorization, Nichols provided WRS financials to other third parties on multiple occasions as part of the conspiracy. He disclosed them to Nunes and Coad, to accountants Nichols used for the National Wheel Entities, and to one or more banks in an attempt to get a loan for one or more of the National Wheel Entities.

31.     WRS also maintained a customer and supplier list that was a multi-year compilation

8

of contacts and locations in the wheel processing industry amassed by WRS in its vehicle wheel salvage business and were unknown to those outside of WRS. This list is a confidential trade secret of WRS. This list contain thousands of names and contact information, along with specific comments about the customer/supplier. It took years for WRS to develop this list.

32. Just before Nichols resigned from WRS in April 2022, he used the WRS server and his WRS email address to send Tipton an email attaching a list of WRS suppliers that was proprietary to WRS. He had also previously sent a list to Tipton on May 23, 2020, of "National Wheel Partners," which was actually a confidential and proprietary list of WRS customers and suppliers.

33. A written copy of the customer and supplier list that was several pages long and consistently maintained in Roark's or Frasier's office disappeared before Frasier, Gandee and Roark resigned from WRS. Upon information and belief, it was taken by one of these Defendant Former Employees for their benefit or the benefit of one or more of the National Wheel Entities. That taking was unauthorized by WRS.

34. On July 23, 2021, Nichols sent Roark many WRS confidential documents pertaining to WRS's operations and suppliers. There was no legitimate WRS business purpose for Nichols to have sent Roark those proprietary documents at that time.

35. Upon information and belief, Frasier took a copy of the confidential driver pick up schedule from the WRS computer system with him when he left. That taking was unauthorized by WRS.

36. WRS takes reasonable steps to protect this confidential information. Among other security measures in place, WRS has a Corporate Security Policy to protect its proprietary database. See attached **Exhibit A.** Employees are made aware of the WRS Corporate Security

9

Policy, which is included in the WRS Employee Handbook, the receipt of which was acknowledged by each employee at the time of hire and as changes were made to the various policies.

37.     Per the WRS Employee Handbook, only certain WRS employees were given access to certain WRS data contained on the proprietary database, namely the data needed to perform their duties, using assigned passwords.  Each employee has their own password.  Employees are not authorized to use any passwords or computers other than those assigned to that employee unless special permission is given to them by the WRS IT department. Moreover, employees are not authorized to access any databases within the WRS database system other than those assigned to that employee to perform their duties, unless special permission is given to them by the WRS IT department.

38.     WRS has security software installed and employees are not permitted to edit or disable the security settings.

39.     Certain WRS information such as WRS financial information, was not maintained on WRS's server or in WRS's databases and was furnished by Bauer or WRS's Chief Financial Officer only to WRS's two Vice Presidents, Walters and Nichols.

**WRS Code of Business Ethics and Employee Handbook**

40.     Defendants Nichols, Roark, Gandee, and Frasier, signed an agreement to comply with the terms of the WRS Code of Business Ethics Policy ("Ethics Code").  Attached as **Exhibit B** is a copy of pertinent excerpts of the Ethics Code.

41.     Defendants Nichols, Roark, Gandee, and Frasier, signed an acknowledgement of receipt of the WRS Employee Handbook ("Handbook").

42.     The Ethics Code, in pertinent part, requires employees to avoid situations where

personal activities and financial affairs may conflict with their responsibility to act in the best interests of WRS; avoid direct or indirect business involvement with competitors or current and prospective business relationships; avoid outside employment or directorship; refrain from work for or service as a director or officer of, or investor in, a competitor; and protect WRS confidential information and intellectual property.

43. Specifically, with respect to protection of WRS confidential information, the Ethics Code states:

> (2) Protect Wheel Recovery Systems', LLC Confidential Information and Intellectual Property. (a) Confidential information of the company regarding, among other things, its products, employees, agents, customers, suppliers, vendors, competitors, business strategy, and financial information, and information regarding Wheel Recovery Systems' intellectual property, including but not limited to, its inventions, processes, patents, trademarks, customer lists and trade secrets are valuable assets of Wheel Recovery Systems, LLC and, as such, employees are responsible for maintaining the value of Wheel Recovery Systems' confidential information and intellectual property. This information may not be disclosed to fellow employees who [do] not need to know, and employees may not improperly use Wheel Recovery Systems, LLC confidential information or intellectual property to provide personal benefit to the employee, a fellow employee, outside persons, or in any way that might be a detriment to Wheel Recovery Systems, LLC. (b) Employees must also take care to treat the confidential information and intellectual property of those individuals and entities that Wheel Recovery Systems, LLC does business within the same manner as Wheel Recovery Systems, LLC property.

44. The Handbook includes a corporate security policy which states, in pertinent part, that WRS is the owner of all data on the company network and computers and may not be used at any time by or for the benefit of any other person or party. The Handbook further provides that no Company files or data are to be removed, in any method, from the premises, or used or retained for personal business. Former employees are not permitted to take any Company data, and the return of any such data is required.

45. The Handbook also includes a confidentiality provision which states, in pertinent

part, that the Company strongly enforces a policy of maintaining confidentiality. Employees are not to disclose any proprietary or confidential information relating to the business, trade secrets, or information about the processes or equipment used. Specifically, it states that "Wheel Recovery Systems is opposed to and will not tolerate any form of discussions or agreements that could jeopardize the operation of the Company."

46.     WRS provided the Defendant Former Employees with training, technical, financial, and administrative support, as well as access to the patented Wheel Processing System ,and WRS's confidential and proprietary customer and supplier information to assist Defendant Former Employees in developing WRS's business and operations.  WRS has spent substantial resources to develop its Wheel Processing System and to market its business.

47.     Each of the Defendant Former Employees had access to this information and was a key employee of WRS.

## Gandee Noncompete

48.     Defendant Gandee signed a Confidentiality, Non-Compete and Assignment Agreement with WRS ("Noncompete"), attached hereto as **Exhibit C**, that provided:

> Covenant Not to Compete. Employee agrees that, for a period of five (5) years after the effective date of this Agreement, Employee will not, directly or indirectly, by himself, or with or through others, engage in any activity that competes with WRS's and/or United Wheel Innovations, Inc.'s vehicle wheel salvage business. Employee agrees that this covenant is reasonable with respect to its duration, scope and geographical area. In the event that the provisions of this covenant should be deemed to exceed the duration, scope and/or geographic area permitted by applicable laws, then such provisions shall be modified to the maximum duration, scope and/or geographical area permitted by such laws. . . .

> Remedies. Employee agrees that a breach of any provision of this Agreement would cause irreparable harm to WRS, and that monetary damages would not be a sufficient remedy for any breach or threatened breach of this Agreement by Employee. Therefore, Employee agrees that WRS shall be entitled to specific performance, preliminary injunctive relief and/or permanent injunctive relief as remedies for any breach or threatened breach of this Agreement by Employee.

Employee further agrees to waive any requirement for security or posting of any bond in connection with such remedies. Such remedies shall not be deemed to be the exclusive remedies for breach or threatened breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

49. **Exhibit C** contains two such agreements signed by Gandee. One is dated June 19, 2014, and the other is dated November 19, 2019. They are identical but for the dates. Gandee's Noncompete is effective until November 19, 2024.

50. Gandee was a WRS employee from 2014-2018 and again from December 2019 to August 2022.

51. Gandee played an integral role in the Wheel Processing System as he was the Coreman who ran the System that was designed to identify the kind of vehicle the wheel is used on, the material the wheel is made from, the condition of the wheel, and which wheels could be resold as "cores" to third parties, as opposed to being sold for salvage value. WRS provided specialized training to Gandee on the System, and Gandee was the primary person to build the proprietary database that is part of the Wheel Processing System, which took years and substantial time, money and effort to build. Gandee also played another important role at WRS as the contact with the WRS customers who bought the valuable cores. As such, he was the "face" of WRS to these important customers.

### Defendants Begin their Conspiracy and Racketeering Scheme

52. Beginning in 2018, or earlier, Defendants Nunes, Nichols, Walters, and Roark created a new wheel repair business under the WRS roof in Tennessee (the "National Wheel Entities' business"). The business plan was created and stored using WRS's computers and email system. See **Exhibits D, E, F and G** (documents from the WRS computer system outlining the various business plans for the National Wheels Entities' business).

53. This wheel repair business was conducted on WRS property, by employees of WRS

13

during their working hours for WRS, using WRS computers and its proprietary information. This continued for four years under the direction of Nichols and Walters, who were assisted along the way by Nunes and Coad from the outside of WRS, as well as Roark, Gandee, and Frasier from the inside of WRS, and likely others.

54.     As recently discovered, Roark was a key part of the conspiracy and openly discussed this separate business with other WRS office employees. She justified the fact that she spent a majority of her working time on the National Wheel Entities' business by explaining that since Bauer did not want WRS to be in the wheel repair business, there was nothing wrong with what was being done. Nonetheless, she requested that WRS employees keep this secret.

55.     While the WRS plant was located in Roane County, Tennessee, Nichols arranged for WRS to lease office space in Knoxville under the guise that the plant did not have office space. Having the office separate from the plant enabled Nichols, Roark, and Walters to conduct and conceal their National Wheel Entities' business as there were no longer as many WRS eyes on them.

56.     Later, when WRS needed to move its plant, Nichols located new space for WRS, but at a greatly increased price, representing to Bauer as sole manager of WRS, that this was the only space available in the area. WRS has since learned that this was not true. Nichols, with Walters' participation, caused WRS to lease far more space than WRS needed, at exorbitant cost, and using multiple buildings on the leased site, due to Nichols' misrepresentations to Bauer that there were no smaller or other buildings at lower cost. This allowed the National Wheel Entities to expand their operations inside the WRS facilities due to the extra space an even to engage their own non-WRS employees to work for the National Wheel Entities in the WRS facility.

57.     On August 16, 2019, the Knox County Clerk issued a Standard Business Tax

License to National Wheel Repair at 110 Center Park Drive, Suite 103, Knoxville TN 37922, required to be posted at the location of the business. This was, at that time, the WRS office address. WRS never authorized any of the Defendants to conduct any National Wheel Entities' business, let alone at any WRS facility or office.

58.     National Wheel's mail went to the WRS offices in Tennessee for several years. That was not known to or authorized by Bauer.

59.     At Nichol's direction, Roark sent to Discount Tire a proof of insurance, a W-9, and a Confidentiality Agreement for National Wheel Repair, using the WRS email address, office address, and the WRS server. Tipton facilitated this as well.

60.     Roark ordered business cards for National Wheel Repair using her WRS email. That was not known to or authorized by Bauer.

61.     Unknown to Bauer, Nichols received a quote at his WRS email address for a complete powder coating system, as well as many other items of equipment, for National Wheel Repair. A powder coating system is used to paint and refinish wheels to make them more valuable in a sale of those refurbished wheels. On information and belief, that powder coating system quote was for one or more of the National Wheel Entities but negotiated by Nichols using the WRS server, his WRS email, and WRS time, employees, and assets.

62.     In addition to Nichols, Walters, and Roark, who worked for one or more of the National Wheel Entities while being paid as employees of WRS, two National Wheel employees, Jake Morgenstern and Taylor Nichols, were given offices in the WRS facility in 2022 where they performed their jobs for one or more of the National Wheel entities

63.     Nichols, Walters, and Roark traveled for the National Wheel Entities' business at the expense of WRS. During 2020-22, with WRS being profitable, Nichols elected to travel first

class, stay in first class hotels, and order expensive meals, without any explanation on his expense reports, and all at WRS's expense, as he conducted National Wheel Entities business on those trips. At least some of Nichols' trips to Tampa and to Chicago were to visit with WRS major suppliers' offices to establish relationships for one or more of the National Wheel Entities, to deal with Coad or Nunes who resided in the Tampa area at the time.

64. As part of the conspirators' scheme, Nichols caused WRS to funnel money to Nunes's business, Jante Wheels US LLC ("Jante"), to help finance Jante and one or more of the National Wheel Entities.

65. Nichols, Roark, and Walters caused WRS to purchase wheels from Jante, instead of purchasing them directly from the third parties who supplied those wheels, which resulted in boosting Jante's sales volume and profits, increasing WRS's cost of goods sold, decreasing WRS's profits and, in part, causing WRS losses because WRS could have bought those same wheels directly from the third parties for the prices Jante paid to them.

66. Jante was buying wheels from third parties such as Terrapin Tire, Wheel Express, and Tire & Wheel, and then on-selling them to WRS, with the sellers drop-shipping those wheels through interstate commerce directly to WRS. Previously, WRS had purchased those wheels directly from the third parties. When compared to other purchases for the same products during the 2018-2020 time period, WRS was paying a significant premium to Jante in excess of the prices WRS paid for product purchases made directly.

67. Additionally, Nichols and Roark sent WRS's confidential monthly financial statements to Nunes, among others, who had no officer, director, employee, or ownership relationship to WRS.

68. Coad operated a facility in Florida for National Wheel Repair at the direction of

16

Nichols and Walters.  As a part of this business, Coad had substantial contact with the State of Tennessee.

<u>**Nichols Intentionally Caused WRS's Customers and Suppliers to Believe that National Wheel and WRS Were One and the Same**</u>

69.     There are several examples of Nichols's actions which intentionally caused WRS customers and suppliers to believe that National Wheel and WRS were one and the same, in a clear attempt to create confusion in the marketplace and to appropriate the WRS business for the benefit of the individual Defendants and the National Wheel entities.

70.     An email chain began on or about November 14, 2019 (the "11/14/19 Email Chain," **Exhibit H**), with an email from a senior director of LKQ in Nashville, Tennessee, to Nichols at WRS and to Preston Garland (an outside vendor for WRS who was one of the named inventors of the patented system described above owned by WRS).  LKQ is one of WRS's biggest customers.

71.     The email has as its subject line: "Open Items with National Wheel Repair (Wheel Recovery)" and continues: "I think we only have 2 outstanding items for this project – 1. Need to get the terms changed on the account in production.  Email sent to AR.  2. Run a test order in production so we can ship it and confirm National Wheel repair gets the order ship confirmation with the tracking number.  Am I missing anything?"  The LKQ director then asked Nichols about a launch date.

72.     Rather than correcting the misrepresentation in the "Subject" line, Nichols continued with his subterfuge by responding as Vice President of WRS.  He replied "Can we run some test orders in production today?  I would like to see how we get the tracking number and make sure everything is working ok."

73.     That same 11/14/19 Email Chain stated that Garland was working on a linked

17

system among National Wheel Repair, LKQ, and Discount Tire.

74.    None of that was disclosed to Bauer, yet, upon information and belief, the "system" referred to in the 11/14/19 email was either the WRS proprietary Wheel Processing System or a specially created system based on the WRS proprietary Wheel Processing System.  In any event, that 11/14/19 Email Chain linked WRS's customer LKQ and WRS's supplier Discount Tire to National Wheel Repair under the guise of WRS.

75.    That 11/14/19 Email Chain continued at least through January 22, 2020, with Nichols continually and purposely allowing LKQ to equate National Wheel Repair with WRS and to create confusion in the marketplace.

76.    The false representation was designed by Nichols, Walters, and Roark to create a relationship between one or more of the National Wheel Entities and both LKQ and Discount Tire for the benefit of the Defendants, as part of the Defendants' scheme to steal the WRS proprietary information and trade secrets, WRS business, and its major suppliers and customers.

77.    Nichols, still using his WRS email address, eventually added Coad (at Coad's National Wheel Entities' email address) to the 11/14/19 Email Chain.

78.    On January 14, 2020, Nichols emailed Coad, Garland and several LKQ employees, using the 11/14/19 Email Chain subject title: "Open Items with National Wheel Repair (Wheel Recovery)," "Guys I think we are really close.  I will be talking with DT [Discount Tire] today to confirm the launch.  I feel like it will be no later than Next Monday.  Maybe this Friday.  I'll email everyone today after my call with DT."

79.    Nichols sent that email in reply to an email earlier that day from LKQ in which he was asked: "Bruce, Do you have a date for when you will turn this on in Production?  Please give us a heads up prior to sending in your first order so we can keep an eye out for it."

80.    On January 22, 2020, Nichols emailed LKQ, copying everyone on that same 11/14/19 Email Chain: "Waiting on your team to replace over 300 bad images.  Duane [Coad] has been working with them on the images.  Once that is done we should be ready to launch a week later possibly."  It appears that the Defendants' scheme was ready to launch in early 2020 but for the Covid pandemic hitting the United States.

81.    Frasier then sent Nichols at WRS photos of wheels under the email Subject "wheel numbers," which Nichols then forwarded to Coad at National Wheel.

82.    That Coad was working on images, or photos, of wheels for National Wheel indicates that the Defendants were engaged in the unauthorized use of, or stealing, the WRS Wheel Processing System and/or the WRS proprietary database.

83.    Another example of confusion in the marketplace occurred with 1-800EveryRim, a WRS customer.  In 2020, a 1-800EveryRim representative sent, to Nichols' WRS email address, an email pertaining to National Wheel operating as a national call center for Discount Tire and sharing inventory among LKQ and National Wheel.

84.    Nichols responded and requested the owner of 1-800EveryRim, with copy to Coad at Coad's National Wheel email address, to change Nichols' email to his National Wheel email account.  Nichols expressed concern that "[t]hings get lost when I have emails regarding both companies coming to one email." This email was signed by Bruce W. Nichols as Vice President of Wheel Recovery Systems.

85.    These examples are known only because of a recent email search of Nichols's WRS email account.

### Fraud Regarding WRS Sponsorship of Tipton's Race Car

86.    Defendants' illegal behavior also manifested itself in a scheme to use WRS funds

under false pretenses to send a kickback to or for the benefit of Tipton at Discount Tire to convince him to move the Discount Tire business from WRS to National Wheel. The fraudulent nature of this scheme was just recently discovered.

87.    Tipton was WRS's contact at Discount Tire, and the person Nichols was calling and emailing to implement the scheme reflected in the 11/14/19 Email Chain described above.

88.    During a telephone conference in November 2020, Walters and Nichols told Bauer on the phone about a $50,000 "sponsorship opportunity with Discount Tire" and requested his approval. The sponsorship was allegedly for a Discount Tire race car through a racing team called CVR.

89.    Contrary to Walters' and Nichols' representations, Discount Tire was not the beneficiary of the $50,000 "sponsorship," and the race car was not a Discount Tire race car. By direction of Nichols, the payment of the $50,000 was paid directly to CVR. The beneficiary was Tipton, and the race car was owned by Tipton.

90.    In the very month following the last of the five $10,000 installment payments, on April 26, Tipton won his first race. A according to a statement made by CVR's owner, Tipton's car was brand new and in its first race.

91.    CVR is a race car business owned by race car builder Chip Vineyard. CVR has its own race cars.

92.    Tipton told CVR that he, Tipton, had some "extra money" and would send it to CVR. That "extra money" or "gift" was the $50,000.00 Tipton deceivingly obtained from WRS, at the fraudulent direction of Nichols and Walters, as a kickback.

93.    Nichols and Walters were knowingly untruthful to WRS when they represented that the "sponsorship" payments were for a Discount Tire race car. They used WRS funds under false

pretenses for the benefit of themselves, Tipton, and National Wheel.

94.     At the same time that Nichols was courting the Discount Tire business for the benefit of the individual Defendants and the National Wheel Entities, WRS later learned that Nichols took advantage of Discount Tire by unilaterally cutting in half the reimbursement price WRS paid to Discount Tire for Discount Tire scrap wheels sold to third parties but paid to WRS. Nichols also articulated to WRS employees that this was how WRS was charging Discount Tire for the boxes purchased by WRS but sent to Discount Tire to pick up Discount Tire's wheels and wheel weights and other scrap.  Nichols, always on the lookout to take advantage of someone, reasoned out loud to a WRS employee that this was fine to do because it was "just a drop in the bucket to Discount Tire" and would go unnoticed.

### Assurance Packaging LLC

95.     As part of their conspiracy to cause WRS to incur more expense and losses, and to weaken WRS as a competitor to one or more of the National Wheel Entities, Assurance was created as directed by Defendants Nichols, Roark, and Walters.  This scheme was only recently discovered by WRS.

96.     Nichols, Walters, and Roark were buying boxes for WRS from Packaging Corporation of America ("PCA").

97.     In 2021, they created Assurance, and caused Assurance to buy boxes from PCA and on-sold those boxes to WRS at about twice the price charged for the same boxes WRS could have bought directly from PCA.  Assurance never took possession of those boxes which were shipped directly to WRS at the direction of Nichols, Walters, and Roark.

98.     Nichols, Walters, and Roark created an account at FirstBank and then Pinnacle Bank in Nashville, Tennessee, for Assurance and also set up an assurancepackaging@yahoo.com

21

email account.

99. Nichols told Roark to send the Assurance bills only to Lynne Ting at the administrative office for WRS in New York. The Nichols' email message was a direction to Roark not to ask or inform Bauer or anyone else at the WRS administrative office, meaning no one else was to know about Assurance. Roark explained to WRS employees that the boxes were purchased for Discount Tire so Discount Tire could send WRS wheel weights and some of the other scrap WRS recycled for Discount Tire. Roark went on to say that WRS would not charge Discount Tire for the boxes but instead would be paying less for the products WRS was purchasing which would cover the cost of the boxes.

100. WRS paid Assurance by checks and wires beginning June 24, 2021, through April 21, 2022, totaling $222,050.00, negotiated at First Bank and later at Pinnacle Bank.

101. This was a scheme that benefitted Assurance, Nichols, Walters, Roark, and the National Wheel Entities to the financial and business detriment of WRS. This scheme was more than usurping a corporate opportunity as it was implemented on WRS premises, using the WRS server and emails, with Roark preparing the Assurance invoices to WRS for the boxes while on the job for WRS. The only "customer" of Assurance was WRS.

102. Mitch Nunes's son, Garrett Nunes, who was not an employee of or independent contractor to WRS, prepared shipping labels to send some of those boxes to Discount Tire locations. Garrett Nunes did that while on the WRS premises using a laptop and printer that connected to the WRS server.

103. In emails to WRS, Roark deceptively presented Assurance as a third party even though she was handling all the labels and invoices for Assurance and her personal mobile number was on the invoices.

104.    Assurance was administratively dissolved by the State of Tennessee on August 9, 2022, within days of Roark's resignation from WRS.

**Bauer Discovers the Conspiracy and Defendants Leave WRS**

105.    Bauer was unaware of Defendants' acts and conspiracy pertaining to the National Wheel Repair Entities' business until March of 2022, when he received a LinkedIn invitation or notice from Taylor Nichols, the daughter of Bruce Nichols, listing her job as "Financial Operations Associate for National Wheel LLC."

106.    Bauer immediately asked his trusted SACO and WRS Vice President and business partner, Walters, if he knew anything about this. Walters did not respond.

107.    Bauer then began looking into the matter and over the course of the investigation discovered the extent of the conspiracy described above. He was shocked.

108.    Bauer's investigation was discovered by Nichols. Nichols, Walters, and Roark then made or finalized plans to leave WRS and to take WRS's customers, suppliers, and employees with them.

109.    Nichols instructed Roark to clean out his office, to remove her laptop that she used for National Wheel, and to remove the Assurance labeling equipment.

110.    During this same timeframe, Nichols, Walters, and Roark through one or more of the National Wheel Entities, purchased a building and told one or more WRS employees to call their WRS contacts and customers and give them Nichols' new cell phone number and to tell them to be ready to switch their business from WRS to the National Wheel Entities.

111.    Over the course of the conspiracy, Defendants have fraudulently concealed their actions from Bauer. As described above, they made false statements to him and WRS, instructed employees not to tell others about National Wheel, took business trips ostensibly for WRS when

they were really doing National Wheel Entities' business, and created a separate email and database for the National Wheel Entities while stealing the confidential, proprietary and trade secret information they needed from WRS. Walters, Roark, and Nichols pretended to be working for WRS while devoting the substantial amount of their working time to the National Wheel Entities' business.

112. Nichols and Roark told employees that Bauer had approved the National Wheel Repair business because it was "not competitive" to WRS. Those statements were false and made with the malicious intent to defraud WRS by causing WRS employees to accept the instructions of Walters and Nichols regarding National Wheel Entities' transactions with the other Defendants, and with others, even if those instructions harmed WRS.

113. Those false statements were also made with the malicious intent to cause WRS employees to leave their employment with WRS in the erroneous belief that to do so would not violate their non-competition and confidentiality obligations to WRS.

114. Walters and Nichols solicited Frasier, Gandee and Roark, as well as multiple other WRS employees, to work for the National Wheel Entities' business while Walters and Nichols were officers of WRS.

115. Upon information and belief, Walters and Nichols also solicited the Discount Tire business for themselves and for the National Wheel Entities while they were officers of WRS.

116. Walters met with Nichols in Tennessee multiple times since the inception of the racketeering enterprise and conspiracy described in this Complaint and continues to meet in Tennessee with Nichols and other Defendants at the National Wheel Entities' facility in Tennessee. Walters was physically present at the National Wheel Entities' premises in Tennessee during August 2022.

117. Nichols and then Walters left WRS's employ first, with Walters simultaneously resigning as a Vice President of SACO, leaving Roark, Gandee, Frasier, and others behind as moles to report to Walters and Nichols about WRS. This also allowed them to continue their scheme of stealing from WRS, and being paid by WRS, as much as they could and for as long as they could until the National Wheel Entities could be up and running, enabling them to be paid without interruption by WRS and then by the National Wheel Entities despite their conspiring with other Defendants to transfer WRS's business to one or more of the National Wheel Entities.

118. As of August 24, 2022, the National Wheel Entities' facility was equipped for the delivery and receipt of equipment and specialized trucks so that the National Wheel Entities' facility would be running at full speed.

119. Frasier has used the confidential driver pick up schedule to contact customers of WRS and to solicit their business for the National Wheel Entities by undercutting what WRS was paying these customers.

120. Frasier was WRS's principal truck driver and in charge of the maintenance of WRS's five trucks. Those trucks were specially outfitted for WRS's business and were covered under a full maintenance agreement with the leasing company.

121. Before leaving WRS's employ, as part of the conspiracy, Frasier made sure that WRS's trucks were not repaired and maintained to the point where the poor condition of those trucks would inhibit WRS's ability to do business.

122. Despite having a noncompete, Gandee left WRS's employment for employment with the National Wheel Entities. Upon information and belief, Gandee is running the same or a copycat system for the National Wheel Entities using the WRS database in violation of his noncompete. His nominal employer is Nichols Properties, where he is performing work directly

for the National Wheel Entities.

123.    A sixth truck was custom ordered in November 2020 for WRS by Nichols and kept in pristine condition, even though WRS already had five trucks and not more than two or three drivers, but Nichols, prior to leaving WRS, told the leasing company that WRS did not need that truck.  That truck is now being leased by one or more of the National Wheel Entities.  Nichols used WRS resources to order the customized truck but deceptively returned it and then obtained it for National Wheel.

124.    On August 12, 2022, a WRS employee inquired with Liberty Tire, a company that aggregated tires, wheels and other scrap from Discount Tire and others, about scheduling a pickup for WRS of Discount Tire wheels.  This supplier informed the WRS employee that Discount Tire had switched to a new company whose contacts were Bruce Nichols and Cheryl Roark.   WRS no longer has Discount Tire as a customer.

125.    That same day, Culpepper CPAs sent Roark the payroll for National Alloys, via email on the WRS server.

126.    Until Defendants started their competing business, WRS had no regional competitors, and only a handful of competitors nationwide.

127.    The harm to WRS by these recently discovered actions of Defendants is irreparable. WRS has unwittingly financed the National Wheel operations.   Defendants have stolen confidential, proprietary, and trade secret information from WRS to enable their competition with WRS.  Under fraudulent pretenses, Defendants have sabotaged WRS and stolen WRS's customers, suppliers, and employees and usurped and misappropriated to themselves the goodwill of WRS. They have created confusion in the marketplace.  The financial harm to WRS is ongoing, as is the unfair competition engaged in by the National Wheel Entities.

128.     By stealing WRS's largest supplier after using WRS resources to do so, the National Wheel Entities are not competing fairly.  The National Wheel Entities are now running their competitive business with money, suppliers, customers, employees, and trade secrets all stolen from WRS.

129.     WRS has sent cease and desist letters to all Defendants, but none of them has agreed to stop their tortious and illegal conduct.

## CAUSES OF ACTION

**COUNT I:     VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT – 18 U.S.C. §§ 1962, et seq.**
**(Against All Defendants)**

130.     WRS restates the allegations above as if fully set forth herein.

131.     Each of the Defendants has conspired individually and as an agent of one or more of the others, to conduct, or engaged in conducting, the affairs of an enterprise through a pattern of racketeering activity aimed to obtain money or property.

132.     The activities of the Defendants when conspiring or engaging in the enterprise racketeering activity were engaging in or affecting interstate commerce through the conduct of providing wheel processing services and sales in the national wheel processing industry.

133.     The activities of the Defendants shared a common purpose, to harm the WRS business for their own personal gain of money or property, and functioned as a continuing unit, and continues to function as such.

134.     Defendants conducted or participated, directly or indirectly, in the enterprise's affairs by running a competitive business using WRS financial and electronic accounts and on WRS premises without the knowledge of and/or authority from WRS, by making an illegal kickback to Tipton, by stealing WRS property and using WRS resources, including funds, while

misrepresenting themselves to the public as conducting their affairs under the authority and identity of WRS.

135. WRS has been damaged by Defendants' pattern of racketeering in an amount to be determined at trial.

## COUNT II: VIOLATION OF THE DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1836
### (Against All Defendants)

136. WRS restates the allegations set forth above as if fully set forth herein.

137. WRS owns and possesses certain confidential, proprietary, and trade secret information, as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836, including, but not limited to, the proprietary Wheel Processing System, its customer lists, supplier lists, price lists, and other financial statements and information.

138. WRS's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

139. WRS has taken reasonable measures to keep such information secret and confidential.

140. WRS has at all times maintained reasonable security measures to preserve the secrecy of its trade secrets as described above.

141. Due to these security measures, WRS's confidential and proprietary trade secret information is not available for others in the wheel processing industry – or any other industry – to use through any legitimate means.

142. WRS's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through

proper means by, persons who could obtain economic value from the disclosure or use of the information.

143. In violation of WRS's rights, each of the Defendants misappropriated WRS's confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

144. Defendants' misappropriation of WRS's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

145. Defendants have attempted, and continue to attempt, to conceal their misappropriation.

146. If Defendants are not enjoined, all Defendants will continue to misappropriate and use WRS's trade secret information for their own benefit and to WRS's detriment.

147. Because WRS's remedy at law is inadequate, WRS seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and to protect other legitimate business interests. WRS's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

148. As a result of Defendants' misappropriation of Plaintiff's trade secrets, Defendants have been unjustly enriched. Plaintiff is entitled to both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation.

149. As the direct and proximate result of Defendants' conduct, WRS has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in part due to lost customers and vendors, in an amount to be proven at trial.

29

150.     WRS has been damaged by all of the foregoing and is entitled to an award of double damages, exemplary damages, and attorney's fees, as well as civil seizure.

## COUNT III:  VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT
### Tenn. Code Ann. § 47-25-1701
### (Against All Defendants)

151.     WRS restates the allegations set forth above as if fully set forth herein.

152.     WRS owns and possesses certain confidential, proprietary, and trade secret information, as defined by Tennessee 's Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, including, but not limited to, the proprietary Wheel Processing System, its customer lists, supplier lists, price lists, and other financial statements and information.

153.     WRS's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

154.     WRS has taken reasonable measures to keep such information secret and confidential.

155.     WRS has at all times maintained reasonable security measures to preserve the secrecy of its trade secrets as described above.

156.     Due to these security measures, WRS's confidential and proprietary trade secret information is not available for others in the wheel processing industry – or any other industry – to use through any legitimate means.

157.     WRS's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain economic value from the disclosure or use of the information.

158.    In violation of WRS's rights, each of the Defendants misappropriated WRS's confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

159.    Defendants' misappropriation of WRS's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

160.    Defendants have attempted, and continue to attempt, to conceal their misappropriation.

161.    If Defendants are not enjoined, all Defendants will continue to misappropriate and use WRS's trade secret information for their own benefit and to WRS's detriment.

162.    Because WRS's remedy at law is inadequate, WRS seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and to protect other legitimate business interests. WRS's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

163.    As a result of Defendants' misappropriation of Plaintiff's trade secrets, Defendants have been unjustly enriched. Plaintiff is entitled to both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation.

164.    As the direct and proximate result of Defendants' conduct, WRS has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in part due to lost customers and vendors, in an amount to be proven at trial.

165.    WRS has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## COUNT IV: CONVERSION
### (Against All Defendants)

166.     Plaintiff restates the allegations above as if fully set forth herein.

167.     Each of the Defendants intentionally converted property, funds, opportunities, and resources belonging to WRS.

168.     Each of the Defendants did this for their own benefit and have profited at the expense of WRS and without a lawful claim to these benefits.

169.     WRS has suffered damages resulting from the intentional conversion of property by the Defendants in an amount to be determined at trial and to include exemplary damages.

## COUNT V:  CIVIL CONSPIRACY
### (Against All Defendants)

170.     WRS restates the allegations set forth above as if fully set forth herein.

171.     Each of the Defendants knowingly and intentionally acted with a common design to accomplish an unlawful purpose by unlawful means and to injure WRS.

172.     Each of the Defendants knowingly and intentionally acted either outside the scope of their employment with WRS or in conspiracy with the WRS employees when taking overt actions contrary to the best interests of WRS and in furtherance of their own best interests, to wit: conducting business at WRS's expense in the name of National Wheel Entities; diverting WRS suppliers, customers, and employees; causing WRS additional expense and lost profits; creating confusion in the marketplace as to the business of WRS thereby harming WRS's competitive standing in the wheel processing industry; making it more difficult for WRS to operate; and misappropriating WRS resources.

173. In so acting, the Defendants engaged in conspiratorial conduct among themselves and with others to further their own personal purposes and to the deliberate detriment and injury of WRS.

174. These actions of the Defendant Former Employees were not those of WRS.

175. WRS has suffered damages resulting from the civil conspiracy in an amount to be determined at trial and to include exemplary damages.

## COUNT VI:  LANHAM ACT
## 15 U.S.C. § 1125
## (Against All Defendants except Tipton)

176. WRS restates the allegations set forth above as if fully set forth herein.

177. The Count VI Defendants have committed several acts of unfair competition in violation of the Lanham Act, 15 U.S.C § 1125, *et seq*.

178. The Count VI Defendants engaged in unfair methods of competition by using certain confidential and proprietary information belonging to WRS to wit: its Wheel Processing System, customer and supplier lists, financial and other account information which constituted WRS personal property, trade secrets and business techniques.

179. As a direct and proximate result of the Count VI Defendants' actions, WRS lost key employees, customers and other prospects and was severely impaired in its ability to conduct its business in the wheel processing industry.

180. Count VI Defendants have in connection with the goods or services of National Wheel Repair, used in commerce a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was likely to cause confusion among WRS's customers and suppliers and in fact did cause confusion among WRS's customers and

suppliers as to the origin, sponsorship, or approval of the Count VI Defendants' goods, services, or commercial activities.

181. Count VI Defendants acted with the intention of causing such confusion, such that their unfair methods of competition were and are intentional.

182. Count VI Defendants' unfair methods of competition were such that in their commercial advertising, promotions, and/or communications, they misrepresented the nature of their goods, services, or commercial activities.

183. Count VI Defendants have falsely represented to, misrepresented, and deceived the purchasing public and the trade in general as to the commercial origin or source of their services so as to cause members of the purchasing public and/or persons in the wheel processing industry in general to falsely or mistakenly believe that the their services have been authorized by, sponsored by, approved by, or are connected or affiliated with the source of WRS and to falsely or mistakenly believe that their services emanate from the same commercial source related to, connected with, or affiliated with that from which the WRS goods and services emanate.

184. Count VI Defendants' unlawful, unjust, and unfair acts and methods of competition has and is being undertaken with knowledge of the business of WRS, and with the deliberate and willful intent to unfairly compete with and harm WRS and to unlawfully and unfairly divert trade, goodwill, and revenue from WRS to the Count VI Defendants, whereby they have been, are being, and will continue to be unjustly enriched with revenue and other benefits proximately caused by and/or resulting from their unlawful, unjust, and acts and methods of unfair competition.

185. WRS has been injured by Count VI Defendants' actions such that its sales, customer base, and share in the market has been, and will continue to be, eroded.

**COUNT VII:  TENNESSEE CONSUMER PROTECTION ACT**
**Tenn. Code Ann.  § 47-18-101 *et seq.***

**(Against Defendants Except Tipton)**

186.     WRS restates the allegations set forth above as if fully set forth herein.

187.     The Count VII Defendants' actions which deceptively appeared to be on behalf of and under the authority of WRS, caused the likelihood of confusion or misunderstanding, thereby allowing their deceptive practices to continue to WRS's detriment.

188.     The Count VII Defendants' false and misleading representation of their National Wheel Entities' business as being associated with WRS violated Tenn. Code Ann. § 47-18-104 (b)(1, 2, 3).

189.     The Count VII Defendants' willful and knowing deceptive acts were conducted with the intent or purpose, either directly or indirectly, of buying and selling products to induce the public to enter into obligations with a competitor.

190.     The Count VII Defendants' willful and knowing deceptive acts were conducted with the intent or purpose, either directly or indirectly, of stealing WRS's workforce.

191.     The Count VII Defendants' actions occurred within the conduct of commerce under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104 (a).

192.     As a result, WRS has suffered and will continue to suffer, an ascertainable loss of money and property, including but not limited to lost customers and/or suppliers, market share, work force, and damage to its business, reputation, and goodwill.

193.     WRS is entitled to all available remedies, including but not limited to its damages, Defendants' profits, and an award of treble damages sustained under Tenn. Code Ann. § 47-18-109(a), and attorneys' fees and costs.

### COUNT VIII:  UNFAIR COMPETITION
### (Against All Defendants except Tipton)

194.     WRS restates the allegations set forth above as if fully set forth herein.

35

195.    The Count VIII Defendants engaged in unfair methods of competition by operating their business while employed by WRS and confusing suppliers and vendors with their real identity.  They profited from the use of materials and resources belonging to WRS and unfairly charged WRS for supplies.  They have taken customers and vendors from WRS as a result of their misrepresentations and false pretenses.  They have used WRS resources to finance their competing business.

196.    The Count VIII Defendants intentionally harmed WRS.

197.    As a direct and proximate result of the Count VIII Defendants' actions, WRS lost key employees, customers and other prospects and was severely impaired in its ability to conduct its business in the wheel processing industry.

198.    WRS has suffered damages resulting from the unfair competition in an amount to be determined at trial and to include exemplary damages.

### COUNT IX:  BREACH OF FIDUCIARY DUTY OF LOYALTY
### (Against Defendant Former Employees)

199.    WRS restates the allegations set forth above as if fully set forth herein.

200.    Defendant Former Employees, as employees or officers of WRS owed obligations to WRS under Tennessee common law and the NDA, Business Ethics Policy, and Handbook.

201.    While employed at WRS, the Defendant Former Employees owed WRS a fiduciary duty of loyalty.

202.    The Defendant Former Employees' actions as set forth herein violated that duty of loyalty.

203.    Defendant Former Employees acted intentionally in the breach of these duties and obligations.

204.    WRS has been damaged financially and in the competitive marketplace and is entitled to damages from the Defendant Former Employees to compensate for their improper acts, including exemplary damages.

205.    Additionally, each of the Defendant Former Employees was being paid to work for WRS, and only WRS, and WRS should therefore be entitled to disgorge each of them for the amounts paid to them by WRS for work and, in the case of Walters, for distributions when they were each working against WRS and/or for other entities, plus interest thereon.

## COUNT X: BREACH OF CONTRACT
### (Against Gandee)

206.    Plaintiff restates the allegations above as if fully set forth herein.

207.    Defendant Gandee was bound by a noncompete provision contained in the Confidentiality, Non-Compete and Assignment Agreement in attached **Exhibit C**.

208.    WRS has a legitimate competitive interest entitling it to enforce this noncompete.

209.    By now working for National Wheel Entities, Gandee has breached that provision.

210.    Gandee's breach is a material breach.

211.    WRS has been harmed by Gandee's competition and is entitled to an order enjoining his breach of contract as well as the damages WRS has incurred.

## COUNT XI:  TORTIOUS INTERFERENCE WITH CONTRACT
### TENN. CODE ANN. § 47-50-109
### (Against National Wheel Entities, Nichols, and Walters)

212.    Plaintiff restates the allegations above as if fully set forth herein.

213.    National Wheel Entities, acting in concert with Nichols and Walters, tortiously induced Gandee to breach his contract with WRS in violation of Tenn. Code Ann. § 47-50-109.

214.    National Wheel Entities, Nichols and Walters had knowledge of Gandee's contract and intentionally and maliciously induced him to breach the contract with WRS.

37

215. National Wheel Entities, Nichols, and Walters acted without privilege or justification.

216. WRS is entitled to all damages caused by this breach, including National Wheel's profits and WRS's attorney fees, which should be trebled per the statute.

### COUNT XII: MISREPRESENTATION
### (Against Walters and Nichols)

217. Plaintiff restates the allegations above as if fully set forth herein.

218. In November 2020, Walters and Nichols misrepresented to Bauer that they had "a sponsorship opportunity with Discount Tire" for a racing team. They communicated this to Bauer during a phone conference across state lines.

219. Walters and Nichols both knew that this statement was false.

220. Bauer, on behalf of WRS, materially relied on this statement and authorized payment of $50,000 by WRS for this "sponsorship" which was really a kickback scheme for the benefit of the National Wheel Entities, Tipton, and Walters and Nichols.

221. As a direct result of this misrepresentation, WRS has been damaged by the loss of these funds as a result of the kickback to Tipton and Discount Tire, including the loss of the Discount Tire business.

222. Walters and Nichols made this misrepresentation with the intention to defraud WRS and benefit themselves.

223. WRS has suffered damages resulting from the misrepresentation in an amount to be determined at trial and to include exemplary damages.

### COUNT XIII: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against All Defendants Except Tipton)

224. Plaintiff restates the allegations above as if fully set forth herein.

38

225.     WRS has existing business relationships with employees, customers, and suppliers.

226.     WRS has prospective relationships with an identifiable class of third persons including investors, consumers, and others engaged in the wheel processing industry.

227.     The Count XIII Defendants have knowledge of these relationships and not a mere awareness of WRS's business relationships.

228.     The Count XIII Defendants intended to and intentionally caused the breach or termination of WRS's business relationships including, but not limited to, Discount Tire.

229.     Through their actions, Count XIII Defendants have actually and already caused WRS to lose prospective business relationships with potential customers and suppliers, and upon information and belief will continue to cause harm.

230.     The Count XIII Defendants' improper motives and/or improper means are evidenced through their false statements; conversion of funds, business, and resources; unfair competition; and breaches of fiduciary duty.

231.     WRS has suffered damages resulting from the tortious interference in an amount to be determined at trial and to include exemplary damages.

## COUNT XIV:  UNJUST ENRICHMENT
### (Against All Defendants)

232.     WRS restates the allegations set forth above as if fully set forth herein.

233.     Each of the Defendants have been improperly and unjustly enriched by the benefits WRS unknowingly conferred on them in the form of free office and storage space, a misrepresented sponsorship, stolen materials, unauthorized funds, and unearned wages (or distributions for Walters), to name a few.

234.     It would be unjust for these Defendants to retain these benefits which have also damaged WRS.

235.    Defendants should disgorge all profits related to these intentional acts.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury for all issues triable by a jury.

**WHEREFORE**, WRS prays for the following relief:

1.    A preliminary and permanent injunction that Gandee not be allowed to work for the National Wheel Entities, including those acting in concert or participation with them, and that the Defendants, including those in active concert or participation with them, cease use of the trade secret and proprietary information that they unlawfully possess that belongs to WRS;

2.    Injunctive relief enjoining the Defendants, and all persons in active concert or participation with any of the Defendants, including each of its officers, directors, affiliates, parents, subsidiaries, agents, servants, employees, accountants and attorneys, from:

(a)    Taking or moving any assets or funds belonging to WRS;

(b)    Using any trade secrets or proprietary information belonging to WRS and returning same to WRS;

(c)    Committing any other unfair business practices directed toward obtaining for any of them the business and customers of WRS;

(d)    Committing any other unfair business practices directed toward devaluing or diminishing the brand or business of WRS; and

(e)    Requiring Defendants to provide an accounting of all funds, books, and records of WRS misappropriated or diverted by any of the Defendants.

3.    A finding of joint and several liability as to all Defendants on all applicable claims;

4.    An award of Compensatory Damages to be determined at trial;

5. An award of exemplary or punitive damages against Defendants, in the applicable and just amounts;

6. An Order requiring an accounting of Defendants' profits derived from their misappropriation of WRS's trade secrets and proprietary information;

7. Trebling of the profits or damages, whichever is greater, together with an award of WRS' reasonable attorneys' fees and expenses, together with prejudgment interest;

8. An Order requiring all Defendants to return all WRS trade secrets and proprietary information to WRS and to cease using any of WRS's trade secrets;

9. An award of double damages, exemplary damages, and attorneys' fees, along with civil seizure under 18 U.S.C. § 1836;

10. An award of Defendants' profits, any damages sustained by WRS, WRS's cost of this action, and WRS's reasonable attorneys' fees under 15 U.S.C. § 1117(a);

11. An Order of accounting, at Defendants' expense, of all funds and assets of WRS that were wrongfully diverted or usurped by any of the Defendants, and disgorgement of same;

12. An award of pre-and post-judgment interest at the maximum amount authorized by applicable law, on all causes of action;

13. An award of discretionary costs to Plaintiff, including any applicable attorneys' fees; and

14. Such other and further relief that the Court deems just and proper.

Respectfully submitted this 30th day of September, 2022.

_/s/ J. Douglas Overbey_
J. Douglas Overbey, BPR No. 006711
Shelly L. Wilson, BPR No. 019935
Owings, Wilson & Coleman
900 S. Gay Street, Suite 800
Knoxville, TN 37902

(865) 521-3010
slwilson@owclaw.com
jdoverbey@owclaw.com

 /s/ Thomas Anthony Swafford
Thomas Anthony Swafford, BPR No. 017578
Tara L. Swafford, BPR No. 017577
W. Lee Maddux, BPR No. 01235
The Swafford Law Firm, PLLC
321 Billingsly Court, Suite 19
Franklin, Tennessee 37067
(615) 599-8406
tony@swaffordlawfirm.com
tara@swaffordlawfirm.com
lee@swaffordlawfirm.com

# **VERIFICATION**

I declare under penalty of perjury that I have reviewed the Complaint and that I know and believe that the allegations about which I have personal knowledge are true. I also declare under penalty of perjury that I believe that the allegations about which I do not have personal knowledge are true based on information and documents in the possession, custody, and control of Plaintiff Wheel Recovery Systems LLC. Dated this 30th day of September 2022.

                                                            Richard Bauer, Managing Member
                                                            Wheel Recovery Systems LLC