UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| WHEEL RECOVERY SYSTEMS, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | 3:22-CV-00342-DCLC-DCP |
| v. | ) ) | |
| BRUCE W. NICHOLS, *et al.,* | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants Bruce W. Nichols ("Nichols"), Thomas Walters ("Walters"), Cheryl Roark ("Roark"), William Gandee ("Gandee"), James Frasier ("Frasier"), National Wheel, LLC, National Alloys Corporation, and Assurance Packaging, LLC (collectively, the "National Wheel Defendants") have moved to dismiss Plaintiffs Wheel Recovery Systems, LLC ("WRS"), Richard H. Bauer ("Bauer"), and Service Aluminum Corporation's ("SACO") First Amended Verified Complaint ("FAC") pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 23.1 [Doc. 93]. Defendant Karl Tipton ("Tipton") has also moved for dismissal of the claims against him under Fed.R.Civ.P. 12(b)(6) [Doc. 92]. While the motions to dismiss were pending, the National Wheel Defendants filed a Motion to Stay the Litigation pending resolution of a petition filed in Delaware Chancery Court to dissolve WRS [Doc. 107]. Plaintiffs have responded to these motions, [Docs. 101, 102, 108], and Defendants have replied [Docs. 105, 106, 109]. The matter is now ripe for review.

## I. BACKGROUND

On April 30, 2013, Richard Bauer executed a "Limited Liability Company Agreement of Wheel Recovery Systems, LLC . . . a Delaware Limited Liability Company (the '<u>LLC</u>')" [Doc.

1

90, pg. 61]. Bauer is identified as "the sole member of the LLC" [*Id.*]. The Agreement provided that Bauer, as the member, "shall own 100% of the membership interests, including all economic and voting interests, in the LLC (the '<u>Membership Interest</u>')" [*Id.*]. It further provided that "[a]ll profits and losses shall be allocated to the Member" and the Member would make "[a]ll . . . accounting decisions and elections required . . . to be made by the LLC for tax purposes . . ." [*Id.*, pgs. 61–62]. The Agreement further provided that "[t]he business and affairs of the LLC shall be managed solely by the Member. The Member may also appoint officers of the LLC with such titles as the Member deems appropriate and delegate such powers as the Member deems appropriate" [*Id.*, pg. 62]. It authorized Bauer to admit additional members with his "written consent" [*Id.*, pg. 63]. If additional members are admitted, Bauer "shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the LLC shall have more than one member" [*Id.*].

Bauer obtained financing for the operations of WRS from Richard Young ("Young") and Walters in exchange for a "profit interest" in WRS [Doc. 90, ¶ 37]. He later gave a "profit interest" to two other SACO shareholders, Edward Klawansky ("Klawansky") and Delvin Litman ("Litman") [*Id.*, ¶ 38]. From 2013 to 2019, Walters filed Schedule K-1 tax forms which indicated he held a 15% interest in the profits and losses of WRS [Doc. 94-7, pgs. 2–3, 11–12, 18–19, 24–25, 30–32, 35–36, 39–40, 43–44]. But his Schedule K-1s identified him as a "General partner or LLC member-manager" [*Id.*, pgs. 3, 12, 19, 25, 32, 36, 40, 44].

On October 31, 2020, Bauer entered into a "Membership Interest Sale Agreement" with Klawansky in which he purchased Klawansky's 10% Membership interest in WRS [Doc. 94-5]. In this agreement Bauer acknowledges Klawansky "became a Member of the Company . . . on and as of April 30, 2013" when he "verbally agreed that [Klawansky] was a Member[] . . . as of its

2

date of formation and the date of the Original Agreement . . ." [*Id.*, pg. 2].  The Sale Agreement noted that "[n]either the Managing Member of the Company nor any other Member of the Company has or owes any fiduciary duties to any of the Parties in any way regarding this [Sale] Agreement . . ." [*Id.*, pg. 5, ¶ 5.3].  It further provided that WRS's "Operating Agreement shall be deemed to be automatically amended . . . by the terms and provisions of this Agreement . . ." [*Id.*, pg. 8, ¶ 14.4].  Bauer signs the Sale Agreement as "Richard H. Bauer, Managing Member" [*Id.*, pg. 10].  It set out the new "Percentages of Membership Interests" as result of the Sale Agreement as follows:

| | |
|---|---|
| Richard H. Bauer | 50% |
| Delvin Litman | 10% |
| Richard A. Young | 25% |
| Thomas Walters | 15% |

[*Id.*, pg. 10].

At the same time, another document was prepared but was not executed by any party.  In it, Klawansky would have sold his Membership interest to Nichols, instead of Bauer [Doc. 94-13, pgs. 2–3].  This unexecuted document purported to explicitly "appoint[]" Bauer as the "sole Managing Member of" WRS and provided that references to the "Member" in the original LLC Agreement meant the "Managing Member" [*Id.*, pg. 4].

Plaintiffs allege that Walters, Roark, Gandee and Frasier conspired together to develop a competing business with WRS in violation of their duties to WRS [Doc. 90, ¶¶ 40, 43, 48].  Plaintiffs claim it has lost significant business as a result [*Id.*, ¶¶ 26, 262].  When Bauer confronted Defendants, they resigned from WRS [*Id.*, ¶¶ 43, 48, 248].  Walters, who had remained in his role as Vice President of SACO [*see id.*, ¶ 39], resigned from that position as well [*Id.*, ¶ 248].  Bauer alleges that these Defendants were operating National Wheel, the name of the competing business, under WRS's roof and using WRS's resources [*Id.*, ¶ 43].  Bauer advised WRS's members of the

3

resignations. Young, who held a 25% Membership interest, replied, "I do not wish to participate in any future business that you determine WRS should pursue . . . In my opinion the company should be closed and all available funds should be distributed to partners" [Doc. 94-15, pg. 2].

WRS filed suit and moved for a temporary restraining order ("TRO") and preliminary injunction [Doc. 3]. The Court denied the TRO, [Doc. 35], and set a hearing on the motion for a preliminary injunction for November 9, 2022 [*See* Doc. 77]. During the hearing, WRS withdrew its motion [*Id.*]. SACO and Bauer then joined as additional Plaintiffs to WRS [Doc. 90]. Bauer asserts a derivative claim in the event the Court finds he lacks the corporate authority to cause WRS to sue [*Id.*, ¶¶ 59, 61].

Defendants argue that Bauer lacked legal authority to have WRS institute this action [Doc. 94, pg. 6]. The remaining Members of WRS (Litman, Young, and Walters) filed with the motion an "Action by Written Consent" asking that lawsuit be dismissed [Doc. 94-16]. The National Wheel Defendants additionally seek dismissal of Bauer as derivative plaintiff based on his purported inadequacy as derivative plaintiff and his failure to make a pre-suit demand [Doc. 94, pg. 20]. They further assert that SACO has failed to allege sufficient facts to state a claim for breach of fiduciary duty against Walters, and consequently, for aiding and abetting that breach against the National Wheel Entities, Nichols, and Roark [*Id.*, pgs. 31, 34]. *See* Fed.R.Civ.P. 12(b)(6). Tipton's motion asserts the Court should dismiss the claims against him under Fed.R.Civ.P. 12(b)(6) [Doc. 92].

While the motions to dismiss were pending, Walters filed a Verified Petition for Dissolution in Delaware Chancery Court seeking dissolution of WRS and appointment of a receiver to wind up the company's affairs [Doc. 107-1, pg. 13]. The National Wheel Defendants seek a stay of these proceedings in their entirety, or in the alternative, a stay of discovery [Doc.

107 pg. 1].

## II. THE NATIONAL WHEEL DEFENDANTS' MOTION TO DISMISS [Doc. 93]

Turning to the National Wheel Defendants' motion, the Court examines whether: (1) Bauer was authorized to cause WRS to initiate this suit, (2) Bauer has satisfied the requirements to proceed as a derivative plaintiff, and (3) SACO has stated a claim for breach of fiduciary duty against Walters and aiding and abetting that breach against the National Wheel Entities, Nichols, and Roark.

### A. Bauer's authority to authorize WRS to initiate this suit

The National Wheel Defendants argue WRS lacks standing because Bauer lacks authority to cause WRS to sue [Doc. 94, pgs. 3–4]. Standing requires Bauer to show he has the proper authority. *See C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *9 (E.D. Ky. Mar. 26, 2019) (finding corporation had "direct standing" to sue based on vote of managing family members); *see also Nord Serv., Inc. v. Palter*, 548 F. Supp. 2d 366, 368 (E.D. Tex. 2008) (analyzing authorization to sue as an Article III standing issue); *First Telebanc Corp. v. First Union Corp.*, No. 02-80715-CIV, 2007 WL 9702557, at *12 (S.D. Fla. Aug. 6, 2007) (holding that a corporate plaintiff lacked standing where the individual filing suit lacked authority).

The National Wheel Defendants argue their challenge to WRS's standing is governed by Fed.R.Civ.P. 12(b)(1) [Doc. 94, pg. 3]. They contend the Court may look beyond the pleadings to consider whether WRS has properly invoked the Court's subject-matter jurisdiction [*Id.*, pgs. 3–4]. However, because standing is a central component of a plaintiff's case and not a mere pleading requirement, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the

5

pleading stage, that burden requires a 'plaintiff[ ] to clearly allege facts that demonstrate each element of standing.'" *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (quoting *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020)). "[T]his standard aligns with the one governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), meaning the [plaintiff] cannot rely on general or conclusory allegations in support of its standing, but instead must assert a plausible claim for why it has standing . . . ." *Id.* (citing *Ass'n of Am Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021)). The Rule 12(b)(6) standard requires the Court take the complaint's factual allegations to be true and construe those allegations in the light most favorable to the plaintiff. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990).

The National Wheel Defendants contend WRS lacks standing to bring this lawsuit because Bauer lacks a controlling vote in WRS's management and all the other Members of WRS oppose the litigation [Doc. 94, pgs. 6–7; *see* Doc. 94-16]. Plaintiffs allege that Bauer is managing member of WRS and thus has the authority to cause WRS to sue [Doc. 90, ¶ 51]. Because WRS is a Delaware LLC, Delaware law governs WRS's membership. *See Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 809 (Del. Ch. 2020).

The Delaware LLC Act "gives parties broad latitude as to the structure of an LLC and the duties of its members through the contractual provisions of their LLC agreement." *Grove v. Brown*, No. CV 6793-VCG, 2013 WL 4041495, at *5 (Del. Ch. Aug. 8, 2013) (citing 6 Del. Code. Ann. §18-1101(b)). The LLC Act provides that an LLC may add members "at the time provided in and upon compliance with the limited liability company agreement . . . ." 6 Del. Code. Ann. § 18-301(b)(1); *see also Maitland v. Int'l Registries, LLC*, No. CIV. A. 3669-CC, 2008 WL 2440521, at *1 (Del. Ch. June 6, 2008) ("Because limited liability companies are organized by

contract, the Court must begin its analysis with [the] LLC Agreement."). An LLC agreement may be "written, oral or implied" and may "consist of 1 or more agreements, instruments or other writings, and may include or incorporate 1 or more schedules, supplements or other writings containing provisions as to the conduct of the business and affairs of the [LLC]." 6 Del. Code Ann. § 18-101(9).

In determining who may make management decisions for WRS—such as deciding whether to initiate a lawsuit—a threshold issue is whether WRS is member-managed or manager-managed [*See* Doc. 94, pgs. 6, 14; Doc. 102, pgs. 15–16]. Although Delaware law provides that an LLC is member-managed by default, the LLC Agreement can change that. 6 Del. Code Ann. § 18-402. The National Wheel Defendants argue one of two situations is possible: (1) WRS is a member-managed LLC initially consisting of five members; or (2) WRS is a manager-managed LLC with the other members joining later and co-managing WRS with Bauer [Doc. 94, pg. 6]. Under either scenario, Defendants contend their approval is necessary for WRS to prosecute this suit [*Id.*]. Plaintiffs contend WRS is manager-managed, and Bauer is the sole manager [Doc. 102, pgs. 15–16].

The LLC Agreement identifies Bauer as the sole member and further provides that Bauer, as "the Member" will manage WRS's business and affairs [Doc. 90, pg. 62]. While Young, Litman, and Walters later became members, they do not point to any document that changes Bauer's responsibility to manage the business and affairs of WRS.

The National Wheel Defendants argue the LLC Agreement is "directly contradicted" by the Sale Agreement [Doc. 94, pg. 8; *see* Doc. 94-5]. The Sale Agreement identifies the "Original Percentages of Membership Interests" with Bauer holding 40% of the "Membership Interests" and Klawansky, Litman, Young, and Walters collectively holding 60% [Doc. 94-5, pg. 10].

7

Defendants argue Bauer only held 40% of WRS' management power as of the date of its formation, so he lacked the authority to execute the original LLC Agreement [Doc. 94, pgs. 13–14]. But the Sale Agreement of Klawanky's interest does not suggest Bauer lacked management authority when he executed the LCC Agreement. The Sale Agreement, in fact, presumes that WRS is managed by a manager-managed framework. In paragraph 5.3, it notes that "the Managing-Member of the Company . . . has [no] . . . fiduciary duties to any of the Parties . . ." [Doc. 94-5, ¶ 5.3]. And Bauer executed the Sale Agreement both individually and as "Managing-Member" [*Id.*, pg. 10].

Defendants contend they never assented to the LLC Agreement before obtaining their membership interests [Doc. 106, pg. 9]. However, Delaware law provides for no such requirement. *See* 6 Del. Code Ann. § 18-101(9) ("A member or manager of a limited liability company . . . is bound by the limited liability company agreement whether or not the member or manager . . . executes the limited liability company agreement").

Defendants next argue the LLC Agreement and Sale Agreement considered together provide Walters, Young, and Litman a vote in WRS' management sufficient to counter Bauer's [Doc. 94, pg. 10; Doc. 106, pg. 4]. Defendants point out the Sale Agreement indicates Walters, Young, and Litman have "Membership Interests" of 15%, 25%, and 10% respectively [Doc. 94, pg. 10; *see* Doc. 94-5, pg. 10]. They argue the Sale Agreement incorporates the LLC Agreement's definition of "Membership Interest," which "include[es] all economic and voting interests, in [WRS]" [Doc. 94, pg. 10; *see* Doc. 90, pg. 61]. Defendants argue the "Membership Interests" set forth in the Sale Agreement include voting interests, not just economic interests [Doc. 94, pg. 10]. But this argument fails to address the fact that the LLC Agreement designates Bauer as the manager of the LLC, regardless of their interests in the LLC. *See* 6 Del. Code Ann. § 18-402 ("[I]f a limited

8

liability company agreement provides for the management, in whole or in part, of a limited liability company by a manager, the management of the limited liability company, to the extent so provided, shall be vested in the manager . . . .").

Defendants next assert that the Court should construe the LLC Agreement to include WRS' other members as co-managers with Bauer [Doc. 94, pg. 14]. They contend the Court should interpret "the Member" as used in the original LLC Agreement to mean "each Member," [*Id.*], including where it provides "[t]he business and affairs of the LLC shall be managed solely by the Member" [Doc. 90, pg. 62]. Defendants offer two reasons for interpreting the LLC Agreement this way: (1) the proposed but ultimately unexecuted Agreement would not have been necessary otherwise, [Doc. 94, pg. 16], and (2) the other members received distributions and profit interests which the original LLC Agreement reserves to "the Member" [*Id.*, pgs. 17–18]. First, the unexecuted Agreement made explicit what was already implicit in both the original LLC Agreement and the Sale Agreement. It did not change anything. That Defendants contend these proposed contemplated changes suggest Bauer lacked management authority ignores the specific language of the LLC Agreement and the Sale Agreement. This argument is without merit.

Second, Defendants argue that Klawansky, Walters, Young, and Litman received profit interests and distributions from WRS, which the original LLC Agreement reserves for "the Member" [Doc. 94, pgs. 17–18]. That could only be possible, Defendants argue, if "the Member" in the original LLC Agreement meant "each Member" [*Id.*]. But Plaintiffs allege that Walters, Young, Litman, and Klawansky obtained a "profit interest" in WRS [Doc. 90, ¶¶ 36–38]. Because they had a profit interest, they were entitled to distributions. *See* 6 Del. Code Ann. § 18-702(b)(2) ("An assignment of a limited liability company interest entitles the assignee to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income,

9

gain, loss, deduction, or credit or similar item to which the assignor was entitled . . .").

Next, the National Wheel Defendants point to the Schedule K-1 tax forms to show WRS was member-managed [Doc. 94, pgs. 10–11]. Some of the forms indicate Walters is a "General partner or LLC member-manager" [Doc. 94-7, pgs. 3, 12, 19, 25, 32, 36, 40, 44]. Annual Report Forms contain a checked box indicating WRS is "Member Managed" [Doc. 94-9, pgs. 5–9, 11, 14, 16, 17]. In a response field requesting names and addresses of managers "[i]f . . . manager managed," some of the forms list Bauer, Young, Walters, Litman, and Klawansky [Doc. 94-9, pgs. 5, 14, 16, 17]. Defendants cite to no authority that an LLC Operating Agreement can be modified without the consent of the members by merely checking a box on a tax form. In fact, the LLC Agreement provides that it can be modified – if done so in writing "signed by the Member" [Doc. 94-5, pg. 16, ¶ 23].

Because Bauer has the authority to cause WRS to initiate this suit, National Wheel Defendants' motion is **DENIED**.

### B. Bauer's derivative claim

Rule 23.1 permits shareholders or members of a corporation to "bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce." Fed.R.Civ.P. 23.1(a). In this case, WRS has not failed to assert its rights. Thus, the Bauer does not need to assert a derivative claim. Defendants' motion to dismiss Bauer's derivative claim is **GRANTED.**

### C. SACO's claims

The National Wheel Defendants assert "Count II must be dismissed because no well-pleaded facts support any of the four elements of a usurpation of corporate opportunity claim . . ." [Doc. 94, pg. 31]. Federal Rule of Civil Procedure 8(a)(2) requires the complaint to contain a

"short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) eliminates a pleading or portion thereof that fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion requires the Court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador*, 902 F.2d at 475. The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court liberally construes the complaint in favor of the opposing party. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

To survive dismissal, the plaintiff must allege facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), and dismissal is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Plaintiffs allege "National Wheel was a corporate opportunity of either WRS or SACO that was usurped by Walters and Nichols" [Doc. 90, ¶ 10]. Plaintiffs claim "[t]his information was recently learned in discovery when it was disclosed that National Wheel is performing business identical to that which would normally be done, if not by WRS, certainly by SACO" [*Id.*]. Defendants seek dismissal of Count II, SACO's claim for breach of fiduciary duty against Walters,

11

[Doc. 94, pg. 31; *see* Doc. 90, ¶¶ 286–294], and Count IV, aiding and abetting breach of fiduciary duty against the National Wheel Entities, Nichols, and Roark [Doc. 94, pg. 34; *see* Doc. 90, ¶¶ 299–302]. These are the only claims asserted by SACO [*See* Doc. 90, ¶¶ 274–406].

Defendants argue the facts alleged in the FAC are insufficient to state a claim that Walters breached his fiduciary duties by usurping a corporate opportunity of SACO [*See* Doc. 94, pg. 32]. Delaware law provides: "a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). "No one factor is dispositive, and all factors must be taken into account insofar as they are applicable." *Id.* "Rulings on business opportunity issues are therefore fact-intensive, and hard and fast rules are not easily crafted." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 852 (Del. Ch. 2022) (quoting *Broz*, 673 A.2d at 155) (internal quotation marks and alterations omitted). The Court examines the four factors in turn.

SACO is in the business of "sourcing and selling wheel processing industry materials, aluminum and other scrap," and that business was successful for SACO [Doc. 90, ¶¶ 29–30]. SACO's successful operation in the wheel processing industry indicates it was in a favorable financial position. "[A] company's line of business includes all activities where the company has fundamental knowledge, practical experience and ability to pursue provided that the activity is consonant with its reasonable needs and aspirations for expansion." *Deane v. Maginn*, No. 2017-0346-LWW, 2022 WL 16557974, at *17 (Del. Ch. Nov. 1, 2022) (quoting *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *16 (Del. Ch. May 13, 2022)) (internal quotation marks omitted). Here,

SACO has adequately alleged National Wheel operates in SACO's business line. SACO's successful operation in the wheel processing industry indicates it had the knowledge, practical experience and ability to engage in the "wheel brokerage business" later undertaken by the National Wheel Entities [*See* Doc. 90, ¶¶ 43–44]. The interest-or-expectancy factor "typically turn[s] on whether the individual who identified the opportunity did so in an official capacity." *Harron*, 275 A.3d at 853. Here, Walters allegedly began a competing business while acting in his official capacity as Vice President of SACO [*see* Doc. 90, ¶¶ 1, 39].

If the fiduciary is "competing in some way with the entity he serves or depriving it of an advantage," that weighs in favor of finding the fiduciary's position is inimical to that of the entity. *Harron*, 275 A.3d at 854. Here, Walters began a business that allegedly competed with WRS [Doc. 90, ¶¶ 241–43, 260–262, 267–272]. SACO was "already buying large quantities of scrap aluminum wheels," for its business of "sourcing and selling wheel processing industry materials" [*Id.*, ¶¶ 29, 31]. WRS' business model appears closely related, though with special focus on "pulling the wheels that were in good enough shape that they could be reconditioned and turned into a finished good for resale" [*Id.*, ¶¶ 31]. Defendants fail to explain how competing with WRS did not also entail competing with SACO given these apparently overlapping businesses. The allegations therefore indicate Walters placed himself in a position inimical to SACO.

Plaintiffs have pleaded sufficient facts to state a claim. Defendants' motion to dismiss SACO's claim against Walters is **DENIED** [*See* Doc. 90, ¶¶ 286–94]. The same is true as to the motion to dismiss Count IV. Regarding Count IV, Defendants' only argument is that it "relies on the deficient allegation of breach of fiduciary duty contained within Count II" [Doc. 94, pg. 34]. Based on the Court's ruling on Count II, Defendants' motion is **DENIED** as to Count IV [*See* Doc. 90, ¶¶ 299–302].

13

### III. DEFENDANT TIPTON'S MOTION TO DISMISS [Doc. 92]

Tipton asserts the Court should dismiss the claims against him pursuant to Fed.R.Civ.P. 12(b)(6) [Doc. 92, pg. 1]. The allegations against Tipton are contained in the following: Count VIII, Tortious Interference with a Business Relationship [Doc. 90, ¶¶ 322–29]; Count IX, Conversion [*Id.*, ¶¶ 330–34]; Count X, Civil Conspiracy [*Id.*, ¶¶ 335–40]; and Count XVII, Unjust Enrichment [*Id.*, ¶¶ 403–06]. The legal standard applicable to Rule 12(b)(6) motions explained above applies to Tipton's motion. The Court will examine each of the claims against Tipton in turn.

#### A. Count VIII: Intentional Interference with a Business Relationship ("IIBR")

Plaintiffs claim "Tipton intended to and intentionally caused the breach or termination of WRS's business relationships [with] … Discount Tire" [Doc. 90, ¶ 326]. Under Tennessee law, an IIBR claim consists of:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal footnotes and citations omitted) (original emphasis omitted). The Court examines each element in turn.

Tipton first argues Plaintiffs fail to allege the existence of an ongoing business relationship between WRS and Discount Tire [Doc. 92, pg. 5]. But according to the FAC, Discount Tire is a "major supplier[]" and "customer[]" of WRS [Doc. 90, ¶¶ 26, 44]. Thus, as alleged in the FAC, there was an existing business relationship between the two entities. Tipton was WRS' "contact" at Discount Tire and allegedly informed Nichols he would "divert" the Discount Tire business to National Wheel [*Id.*, ¶¶ 174, 183]. Thus, the FAC alleges Tipton knew about the relationship and

14

intended to terminate it.

Tipton next contends he lacked improper motive and improper means [Doc. 92, pgs. 9–10]. The Tennessee Supreme Court has cited "bribery" as an example of improper means to support an IIBR claim. *Trau-Med*., 71 S.W.3d at 701 n. 5. Here, the FAC alleges Tipton was the beneficiary of a $50,000 payment procured by Nichols and paid to racing team CVR for a personal racecar for Tipton [Doc. 90, ¶ 177]. Tipton allegedly told CVR he had "extra money" and would send it to CVR, and the FAC states that "extra money" was the $50,000 payment [*Id.*, ¶¶ 179–80]. Plaintiffs allege that as a "*quid pro quo*" for that payment Tipton "divert[ed]" the Discount Tire business from WRS to National Wheel [*Id.*, ¶ 185]. The FAC alleges "WRS received no known benefit for making this payment" [*Id.*, ¶ 176]. There is no indication Discount Tire benefitted either because the payment had nothing to do with any "sponsorship opportunity" the payment purported to support [*Id.*]. Tipton contends no bribery occurred because Tennessee's criminal statutes only penalize bribery of public servants, Tenn. Code Ann. § 39-16-102; witnesses, *id.*, § 39-16-107; and jurors. *Id.*, § 39-16-108; [Doc. 92, pg. 10]. But the issue is not whether Tipton violated any criminal statute—it is whether Tipton acted with "improper means." *Trau-Med*, 71 S.W.3d at 701. Plaintiffs have sufficiently alleged improper means, as well as damages resulting from the alleged termination [*See* Doc. 90, ¶¶ 326, 329].

Tipton contends that because he is a Discount Tire Employee, Discount Tire's "dealer privilege" not to do business with WRS shields him from IIBR liability [Doc. 92, pg. 6]. Plaintiffs do not dispute that "Discount Tire had no legal obligation to do business with WRS . . ."; instead, they argue Discount Tire's dealer privilege does not protect Tipton because "the fruits and purpose of the CVR/Tipton bribe was solely to benefit Tipton and the Defendants," not Discount Tire [Doc. 101, pg. 8].

15

The dealer privilege stems from the principle that "a party to a contract"—or relationship—"cannot be liable for tortious interference with that contract" or relationship. *Cambio Health Sols., LLC v. Reardon*, 213 S.W.3d 785, 789 (Tenn. 2006) (citing *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn.1977)). Accordingly, "a supplier has a privilege that allows it to refuse to sell and … such a refusal to deal is not improper." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 178 (Tenn. Ct. App. 2007). When the party refusing to deal is a corporation, the privilege extends to those who share a "unity of interest" with the corporation. *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 782 (Tenn. 2000) (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 334–35 (Tenn. 1994)). Employees lack unity of interest with their corporate employer when "acting outside the scope of [their] authority, acting with malice, or acting to serve [their] own interests." *Forrester*, 869 S.W.2d at 333 (quotations and citations omitted). Otherwise, the privilege generally extends to "a corporate director, officer, or employee … because he is considered a party to the contract, as long as he is acting to serve the corporate interests . . . ." *Id.* (quotations and citations omitted).

The FAC alleges WRS had begun to "slow pay" Discount Tire's invoices, creating the appearance WRS was a credit risk. [Doc. 90, ¶ 184]. Plaintiffs contend that Tipton acted outside the scope of his employment when he allegedly accepted the benefit of the $50,000 payment to CVR [Doc. 101, pg. 10]. At this stage, it simply is too early to judge whether the dealer privilege applies or not. Tipton's motion is **DENIED** as to Count VIII.

## B.   Count IX: Conversion

The FAC alleges "[e]ach of the Defendants intentionally converted, or aided and abetted in the conversion of, property, funds, and resources belonging to WRS …" [Doc. 90, ¶ 331]. "Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance

16

of the owner's rights." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965) and *Lance Prods., Inc. v. Commerce Union Bank,* 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)).  To state a claim for conversion under Tennessee law, a plaintiff must allege: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *Id.*  "To be liable, the defendant need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights," and "good faith is generally immaterial." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

Plaintiffs point to two items of "property" allegedly converted by Tipton: (1) "the Discount Tire business" and (2) the $50,000 purported bribe he received [Doc. 101, pg. 14]. As to the Discount Tire business, hypothetical transactions are not "tangible property," so they cannot support a conversion claim.  *PNC*, 387 S.W.3d at 553; *see B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 679–80 (Tenn. Ct. App. 1995) (affirming grant of summary judgment against plaintiff claiming conversion of its interest in business relationships).

That leaves the alleged $50,000 payment to CVR on Tipton's behalf.  "Misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion." *PNC*, 387 S.W.3d at 553–54 (quoting 90 C.J.S. Trover and Conversion § 16).  The parties dispute the pleading standard applicable to the conversion claim.  Tipton contends Tenn.R.Civ.P. 9.02 requires plaintiffs to plead conversion claims with particularity [Doc. 92, pgs. 10–11]; *see PNC*, 387 S.W.3d at 555.  Plaintiffs contend the Federal Rules apply [Doc. 101, pg. 14].  But even if the heightened standard under the Tennessee Rules applies, Plaintiffs have pleaded their conversion claims with particularity.  They allege the payment's amount, the number

17

of installments, the party who received the funds, and the beneficiary [Doc. 90, ¶¶ 177–78].

Tipton argues the FAC fails to allege he "received or exercised control over" those funds [Doc. 92, pg. 11]. He contends Plaintiffs' allegations are conclusory because they fail to state how he "used, received, or otherwise benefitted from that payment" [*Id.*, pg. 12]. But according to the FAC, Tipton did benefit. Plaintiffs allege the payment partially satisfied the cost of a personal racecar from CVR [Doc. 90, ¶¶ 177–81]. They further allege WRS "received no known benefit" from the payment [*Id.*, ¶ 176]. Because the facts alleged are sufficient to sustain a conversion claim, Tipton's motion is **DENIED** as to that claim.[1]

## C.      Count X: Civil Conspiracy

Plaintiffs next allege "[e]ach of the Defendants [including Tipton] knowingly and intentionally acted with a common design to accomplish an unlawful purpose by unlawful means and to injure WRS . . ." [Doc. 90, ¶ 336]. "The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006). Each member of the alleged conspiracy must "hav[e] the intent and knowledge of the other's intent" to further the unlawful means or purpose of the conspiracy. *Trau-Med*, 71 S.W.3d at 703.

Tipton argues Plaintiffs fail to allege facts showing a common design between Tipton and the other defendants to achieve any unlawful purpose, engage in unlawful conduct, or harm WRS [Doc. 92, pg. 14]. Plaintiffs claim Tipton took part in "conversations with Nichols where they

---

[1]      Because the Court declines to dismiss the conversion claim, the Court need not address Tipton's argument that Plaintiffs' aiding and abetting theory fails [*See* Doc. 92, pg. 12].

conspired to transfer WRS's business, including the business of Discount Tire, to the National Wheel Entities" [Doc. 101, pg. 19]. In support of that claim, Plaintiffs cite paragraphs of the FAC detailing an email chain where various individuals were "working on a linked system among National Wheel Repair, LKQ, and Discount Tire" [*Id.*; Doc. 90, ¶ 155 *see* Doc. 90, ¶¶ 151, 155, 156, 157, 158, 161, 163]. Plaintiffs point to allegations that "Tipton was . . . the person Nichols was calling and emailing to implement the scheme reflected in the . . . Email Chain" [Doc. 101, pg. 19; Doc. 90, ¶ 174]. They point to a conversation between Nichols and Tipton where Tipton informed Nichols he would "divert" the Discount Tire business [Doc. 101, pg. 19; Doc. 90, ¶ 183]. Plaintiffs allege "Nichols and Walters were knowingly untruthful to WRS" when they obtained funds to "bribe" Tipton [Doc. 101, pgs. 19–20; Doc. 90, ¶¶ 173, 182–83]. At this stage, the allegations are sufficient. Tipton's motion to dismiss Count X is **DENIED**.

### D.    Count XVII: Unjust Enrichment

Plaintiffs assert Tipton has been "improperly and unjustly enriched by the benefits WRS unknowingly conferred on [him] in the form of . . . a misrepresented sponsorship . . ." [Doc. 90, ¶ 404]. "The elements of an unjust enrichment claim are: 1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966)) (internal quotation marks omitted). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* (citing *Paschall's*, 407 S.W.2d at 155 and *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)).

Tipton argues he was not unjustly enriched for the same reasons he argues he did not

convert the $50,000 payment: that the FAC fails to allege he "received or exercised control" over those funds [Doc. 92, pgs. 11–12]. But as explained, even if Tipton did not possess those funds, the FAC alleges he received a benefit because that money went to fund his receipt of a personal racecar from CVR [Doc. 90, ¶¶ 176–181]. According to the FAC, Tipton told CVR he would send "extra money," referring to that $50,000 payment, indicating he appreciated the benefit [*Id.*, ¶¶ 179–80]. Tipton fails to explain why his retention of that benefit would not be unjust [*See* Doc. 92, pgs. 11–12]. Accordingly, Tipton's motion is **DENIED** as to the unjust-enrichment claim.

## IV. THE NATIONAL WHEEL DEFENDANTS' MOTION TO STAY [Doc. 107]

The National Wheel Defendants ask the Court to stay the case while Walters' petition to dissolve WRS is pending in the Delaware Court of Chancery [Doc. 107, pg. 1]. They assert that those proceedings will resolve the threshold issue of whether WRS is deadlocked, which is governed by Delaware law [*Id.*, pgs. 2, 5–7]. In the alternative, they argue the Court should stay discovery to prevent potentially unnecessary expense for all parties [*Id.*, pgs. 7–9]. Plaintiffs oppose a stay, arguing this case was filed first, the delay would prejudice them, the Delaware petition is unlikely to succeed, and Defendants fail to show good cause to stay discovery [Doc. 108, pgs. 5, 6, 8, 10].

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket …, and the entry of such an order ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Env't Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977)). "[A] court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Env't Council*, 565 F.2d at 396. In determining whether to grant a stay, the Court considers:

20

"(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation . . . ." *Doe as next friend of Doe 1 v. Varsity Brands, LLC*, No. 222CV02657JTFTMP, 2023 WL 3090041, at *2 (W.D. Tenn. Apr. 25, 2023) (quoting *Dunaway v. Purdue Pharma L.P.*, 391 F.Supp.3d 802, 807 (M.D. Tenn. 2019)).

Here, Defendants fail to show a stay is appropriate. The Delaware court may dissolve WRS, or it may not. If not, further delay will result, and the merits of this case will still need to be decided. Plaintiffs contend the alleged lost profits to WRS and SACO will continue during that time, causing them prejudice [Doc. 108, pgs. 6–7]. And, as Plaintiffs point out, there is no indication that WRS' dissolution would impact SACO's claims [*Id.*, pg. 7].

Defendants argue they would experience hardship without a stay because this litigation will impose cost on them until the Delaware court appoints a receiver [Doc. 109, pg. 8]. Defendants further assert Bauer is causing corporate waste by instituting this action [*Id.*, pg. 8]. But as explained in connection with Defendant's Motion to Dismiss, the Court cannot conclude at this stage that Bauer lacks the authority to bring this lawsuit. Defendants fail to show the appointment of a receiver is likely, or that the pursuit of this lawsuit constitutes corporate waste.

Moreover, the judicial resources saved by a stay would be minimal. The Court has now ruled on the pending motions to dismiss, and the possibility of an intervening determination on WRS' alleged deadlock would not unduly hinder judicial economy. Defendants argue a stay would serve judicial economy because the proceedings in Delaware are summary proceedings [Doc. 107, pg. 5]. They cite an unpublished Delaware Chancery Court opinion in which the court noted "[a]ctions seeking the appointment of a custodian or the dissolution of an entity are said to be summary proceedings." *Friendly Ghost Enterprises, LLC v. McWilliams*, No. CIV.A. 2935-VCN,

2007 WL 2198767, at *2 n. 6 (Del. Ch. July 27, 2007). Yet in that case, the court stayed a matter seeking dissolution for related claims to proceed to arbitration. *Id.* Defendants cite no other Delaware law for their assertion the Delaware court will address their petition in summary fashion [*See* Doc. 107, pg. 5]. In any event, Plaintiffs contend there has been no motion to expedite the Delaware proceedings, and Defendants failed to request a summary proceeding in a document filed with the Delaware court [Doc. 108, pg. 7; Doc. 108-1, pg. 2]. Because the National Wheel Defendants fail to show a stay is appropriate, their motion [Doc. 107] is **DENIED**.

## V.    CONCLUSION

For these reasons, the National Wheel Defendants' Motion to Dismiss [Doc. 93] is **GRANTED IN PART AND DENIED IN PART**. Bauer is **DISMISSED** as a derivative plaintiff. Tipton's motion [Doc. 92] is **DENIED**. The National Wheel Defendants' Motion to Stay [Doc. 107] is **DENIED**.

SO ORDERED:

s/Clifton L. Corker
United States District Judge